UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10826 GAO

*************************************
DONALD STRUNK                          *
   Plaintiff                           *
                                       *
   v.                                  *
                                       *
DONALD RUMSFELD, SECRETARY,             *
DEPARTMENT OF DEFENSE                   *
   Defendants                          *
*************************************

**PLAINTIFF'S RULE 56.1 STATEMENT OF DISPUTED FACTS
AND RELEVANT FACTS IGNORED BY DEFENDANT**

1.      Undisputed

2.      Undisputed

3.      Undisputed

4.      Undisputed

5.      Undisputed

6.      Undisputed

7.      Undisputed

8.      Undisputed

9.      Undisputed

10.     Undisputed

11.     Undisputed

12.     Undisputed

13.    Undisputed

14.    Undisputed

15.    Undisputed

16.    Undisputed

17.    Undisputed

18.    Disputed.

     a.    In his current EEO complaint to the Agency, Strunk alleged discrimination on the basis of age (DOB 09/06/53), disability (gastro-intestinal problems, muscular skeletal disorders and skin abnormalities rated 70% disabled by the Veterans Administration) and retaliation for prior EEO activity on August 8, 2003, he learned that he was not selected for the position of Director, Program Support and Customer Relations, GS-1101-14/15, under Job Announcement Number DCMAE-03–2160. (Defendant's Tab 7 - EEO Decision, 12/2/04)

19.    Undisputed

20.    Undisputed

21.    Undisputed

22.    Undisputed

23.    Undisputed

24.    Undisputed

25.    Undisputed

26.    Undisputed

27.    Undisputed

28.    Undisputed

2

29.    Undisputed

30.    Undisputed

31.    Undisputed

32.    Undisputed

33.    Undisputed

34.    Undisputed

35.    Undisputed

36.    Undisputed

37.    Undisputed

38.    Undisputed

39.    Undisputed

40.    Undisputed

41.    Disputed

    a.    Strunk was discriminated against as he was later rated not competitive and removed from referrals for consideration for this position despite the requirement under the Disabled Veterans Affirmative Action Plan which required that Strunk remain qualified and referred. By letter dated August 8, 2003, Strunk was advised by that he was not selected for this position and instead it had been awarded to Noreen Cassaro. Ms Cassaro applied for the position when the job announcement period had closed, and her application should not have been considered. Evidence submitted to a NAGE/DCMA Arbitration case documented the fact the Cassaro application was received outside the regulatory time period. (Strunk Affidavit)

42.    Undisputed

43.    Undisputed

44.    Undisputed

45.    Undisputed

46.    Undisputed

47.    Undisputed

48.    Undisputed

49.    Undisputed

50.    Undisputed

51.    Undisputed

52.    Undisputed

53.    Undisputed

54.    Disputed

   a.    Later, in March, 2005, the defendants again discriminated and retaliated against Strunk by non competitively appointing Margaret Ciocca to the position of Deputy Director, Program Support and Customer Relations, DCMAE-PI, GS 1101-14, Boston, Massachusetts.  The position Deputy Director, Program Support and Customer Relations, DCMAE-PI, GS 1101-14, Boston, Massachusetts required Defense Acquisition Workforce Improvement Act Certification in Program Management and Defense Acquisition Corps Membership.  Margaret Ciocca is not a member of the Defense Acquisition Corps nor does she hold any Defense Acquisition Workforce Improvement Act Certifications.  Strunk was discriminated and retaliated against as Strunk was qualified for this non competitive position and not appointed despite the requirement under the Disabled Veterans Affirmative

4

Action Plan, which requires non competitive appointments of DAV to promotional opportunities for which they are qualified. Strunk superseded the minimum qualifications for the position in question. Strunk is a member of the Defense Acquisition Corps. He should have been awarded these positions in question. (Strunk Affidavit)

55.    Undisputed

56.    Undisputed

57.    Undisputed

58.    Undisputed

59.    Undisputed

60.    Undisputed

61.    Undisputed

62.    Undisputed

63.    Undisputed

64.    Undisputed

65.    Undisputed

66.    Undisputed

67.    Undisputed

68.    Undisputed

69.    Undisputed

70.    Undisputed

71.    Undisputed

72.    Undisputed

73.    Undisputed

74.    Undisputed

75.    Undisputed

76.    Undisputed

77.    Undisputed

78.    Undisputed

79.    Undisputed

80.    Undisputed

81.    Undisputed

82.    Undisputed

83.    Undisputed

84.    Disputed

    a.    The Defendant has not complied with the terms of this agreement. Strunk has been told to sign his evaluations based on existing verbiage in the job description but never made any agreement with Mr. Sweeney or the Agency releasing the requirement to re-write his position description. (Strunk Affidavit)

85.    Undisputed

    a.    However, in its Statement of Facts, the Defendant never addresses any facts as to whether Strunk was the victim of discrimination or retaliation. All of these facts are included in his affidavit, including the following:

        i.    Strunk is a 70% disabled veteran.

6

ii.    In November, 1999, Strunk was promoted from a GS1102-12 Cost Price Analyst at DCMA Raytheon to a GS 1102-13 Staff Contract Administrator. Strunk was selected by Mr. Ronald Murphy, a GS1401-14, who served in the position of Chief Program Integration and Support Group, that later became the Director of Program Support and Customer Relations. Mr. Murphy had been recently reassigned to this position from a Washington headquarters position as he needed to return to Boston to care for a family member. Mr. Murphy informed Strunk that he had selected Strunk based on his exemplary work record and extremely high recommendations from both Mr. Anthony Coit, his second tier supervisor, and his Commander Colonel Bryon Young. Mr. Murphy explained to Strunk that he was the only Level III Contracting Professional in the Office, that Mr. Sinha, Mr. Corrente, Mr. Dan Wilson, Mr. Rob Benicewicz, and Mr. Byron Reynolds (all GS 1101-13) were level III Program Managers and that Ms. Linda Maturo (GS-0343-13) and Ms. Vera Daniels (GS0343-12) were Management Analysts with no Defense Acquisition Workforce Certifications required.

iii.    Mr. Murphy stated that a Program Management type could not perform the office functions required and that a Contract type was required in his opinion to work with the DCMA subordinate offices, Program Integrators, and the external customers.

iv.    From the time of his promotion in November, 1999, until September, 2000, Strunk had worked very closely with daily contact with his Agency

Headquarters staff especially with Colonel Lou Sands and with high level DCMAE external customers. Strunk had also worked with DCMAE HQ Staff: Mr. Gary Antaya (Director of Finance DCMAE) as a member of management review teams, the lead providing oversight to subordinate DCMA field offices. Strunk had worked with Mr. John Sheehan a DCMAE GS1102-13 on a high level customer support assessment and the development of a business case. Strunk was responsible for the Early Contract Administrative Services Executive Agency given to DCMAE for the DCMA Headquarters and also assisted in rewriting agency guidance, which renamed this function Acquisition Planning and Support Services. In November, 2000, Strunk received a scheduled step increase in his pay. In January, 2001, Mr. Joseph Sweeney signed his performance appraisal for this time period with the highest rating possible.

v.      In approximately late June, 2000, the Program Integration and Support Group was elevated to a Directorate and named the Program Support and Customer Relations Directorate. Mr. Joseph Sweeney was selected over Mr. Ronald Murphy and appointed the Director. In June the very first time Strunk meet Mr. Sweeney as his supervisor, Mr. Sweeney told Strunk that Acquisition Planning and Support Services (Formerly Early Contract Administrative Services) where not going to be performed by "his" directorate and that Strunk was no longer to perform these duties or have any direct contact with any headquarters staff except through him. This left Strunk with no work

8

assignment.

vi.    In 2003 Linda Maturo in her position of Director Program Support and Customer Relations certified that Ms. Vera Daniels had Level III Contracts functional duties with the directorate.   Strunk's understanding of the duties of Vera Daniels in July, 2005, was that they where the same as those Strunk had before Mr. Sweeney became Director of Program Support and Customer Relations and removed these same duties from him.

vii.    Mr. Sweeney told Strunk that everyone in the new Directorate would need to be retrained into the Program Management Career Field.  Everyone in the office in August, 2000, received work assignments except Strunk.   Linda Maturo and Michael Corrente began to get assigned regularly as acting director.  Linda Maturo began to get work assignments similar in nature to Strunk's former position as Early CAS Manager, and Strunk was given the position of Training Coordinator, a position that was widely thought of as a GS 07 clerk's responsibility.

viii.    Mr. Sweeney intentionally changed the duty stations of Byron Reynolds and Dan Wilson to Boston to force Reynolds to retire.  Strunk later overheard Mr. Sweeney speaking in his office bragging to someone on the phone that both Byron Reynolds had retired rather accepting the change and that he was allowing Dan Wilson to now stay in New Jersey.

ix.    In July, 2000, Joseph Sweeney gave Linda Maturo the assignment of Industrial Analysis Coordinator so she could attend the Industrial Analysis

9

Conference in San Diego.  Maturo was scheduled to go and received orders for the trip.  A week before the trip the East District Director decided to transfer the Industrial Analysis Coordinator function from Program Management Directorate back to Operations.  Mr. William Murphy, a 55 year old Disabled Veteran, already had this assignment and Linda Maturo was the alternate.  Strunk was given the alternate Industrial Analysis Coordinators position and given orders to attend the San Diego Conference in August, 2000.  Neither Mr. Murphy nor Strunk was given the knowledge that the position was to be transferred out of the directorate.  Upon their return from the training Mr. Sweeney informed Mr. Murphy and Strunk that they were to be transferred to the Operations Directorate.  Mr. Murphy was soon thereafter transferred to Operations as only one slot was transferred and Strunk remained in PI.

x.    Mr. William Murphy and Strunk had had numerous conversations regarding Mr. Sweeney and the fact that they both felt he wanted to get "rid off" all of the older guys in the office as soon as he was appointed the Director.  This included Byron Reynolds, Bill Murphy, Bob Benicewicz, and Strunk.

xi.    By October, 2000, Strunk knew he needed to get away from this situation and Mr. Sweeney.  Strunk saw his only option that could not be blocked by Mr. Sweeney as being a hazardous duty assignment to a combat area assigned to a CAS Combat Support Team.  Strunk volunteered for an assignment to Bosnia and was accepted and assigned to a combat support team scheduled

10

to deploy to Bosnia in January, 2001.

xii.   It seemed to Strunk as soon as Mr. Sweeney knew that Strunk was leaving the office on the deployment, he immediately stopped harassing Strunk. In November and December of 2000 Strunk spent the greater portion of his time preparing for deployment with medical exams and appointments, pre-deployment administration, and getting uniforms, etc. Strunk received orders and was scheduled to deploy on 14 January 2001.

xiii.  The first week of January, 2001, Strunk had an eruption of a service connected disability and was admitted into Massachusetts General Hospital. Strunk then spent the next four months in a hospital bed and missed his deployment. At approximately the end of April, 2001, Strunk returned to work with a surgical stoma on his stomach covered by a medical device. Mr. Sweeney immediately started to harass Strunk just as he did before.

xiv.   Within an hour of Strunk's return to duty Mr. Sweeney called Strunk into his office and his first words where something to the effect of: "So you are going to retire on a Veterans disability or something?" Shortly after that time he began to ridicule publicly Strunk as a matter of course.

xv.    On one occasion in approximately June, 2001, Mr. Sweeney used the fact that Strunk's "Fly Was Down" to ridicule him in front of all the persons in the office. Strunk was unable to fully close his waistband because of his medical appliance which caused his zipper to open. Strunk was so enraged by this embarrassment that Strunk started to take administrative action

through the union. Strunk sent Mr. Sweeney an email with his objections, and he responded with a written apology by email.

xvi.  In the end of July, 2001, Strunk had a second surgery to close the stoma and reconnect his intestines. Strunk had another month convalescing and upon his return in late September, 2001, Linda Maturo was acting Director. Strunk met with her on his first afternoon back to work to discuss his workload. Strunk informed her that he was going to take his first week and complete and file a series of SITREP reports Mr. Sweeney had set as a job requirement, the majority of which covered the period in which Strunk was out sick. Ms Maturo directed Strunk not file these reports and directed him to another assignment, telling him it was a higher priority.

xvii.  At the end of August, 2001, the DCMAE-PI Directorate moved to the 9th floor, and Strunk was given the worst desk assignment -- one typically given to a copy or fax machine. Strunk was the only one in the office in full view of everyone in the hallway. Strunk asked Mr. Sweeney for a more desirable location as there where many empty cubicles and was refused. This was uncomfortable, and Strunk received a great number of chides from co-workers due to this cubicle assignment.

xviii.  Mr. Sweeney did not provide Strunk with appropriate level work. He constantly berated Strunk and used a disrespectful tone of voice every time he spoke with Strunk. He constantly harassed Strunk over things such as time and attendance and computer usage that others in the District did not

12

suffer.  An example of this can be had in the fact that Strunk was harassed for time given a suspension for attending the Raytheon Christmas function. Others from the district went on official time, and Strunk was harassed by a one day suspension.  Others from DCMI was not sure whether that was because of the Christmas party or the normal harassment Strunk received over VA sick time Mr. Sweeney always gave Strunk.

xix.   Mr. Sweeney forced Strunk to tell him the medical requirement or nature of every hour of sick leave Strunk requested for his disability or he said he would not approve it.  He reiterated time and time again: "He had a right to know".   Mr. Sweeney would say: "I don't' believe you; you are lying to me."   Strunk applied for numerous other jobs but was told by a number of people that Sweeney was constantly speaking in poor reference to him any time they observed him.

xx.   Mr. Sweeney made direct insults to Strunk it seemed any time Strunk was with him and at all times tried to verbally abuse and embarrass Strunk. Many of these were about Strunk's physical condition.

xxi.   Shortly after the meeting with Maturo in October, 2001, Mr. Sweeney informed Strunk that he was giving Strunk an unsatisfactory rating specifically for not filing these reports and withholding his step increase. Additionally that Mr. Sweeney was placing Strunk on a performance improvement program from which Strunk could be fired.  Strunk felt that Linda Maturo must have known this was coming and her directive not to file

13

the SITREP reports now made sense. Strunk felt/knew this was the culmination of Mr. Sweeney's attempts to get rid of the last older guy in his unit as Bob Benicewicz had retired. Strunk also was made to feel Mr. Sweeney resented the fact that Strunk had disabilities and required sick leave.

xxii. From November 2001 to December 2001, Mr. Joseph Sweeney increased his hourly harassment of Strunk. Daily in front of the entire office he would berate him personally and professionally screaming at Strunk, telling him that his work was substandard. He constantly sent harassing emails to Strunk and monitored his emails when he did not treat others in the office the same way. This caused Strunk to have psychological related gastro intestinal difficulties for which Strunk was treated.

xxiii. Strunk secured letters of accolade from everyone Strunk had worked with or for at the district since November, 1999, and collected all records of his past performance. Strunk presented this documented evidence of exemplary work record to Mr. Joseph Cass, Director DCMAE, asking for his assistance based on the evidence that except for Mr. Sweeney, anyone Strunk ever worked for or with thought Strunk did an excellent job and that Strunk had performance awards for all periods of employment except under Mr. Sweeney.

xxiv. The settlement agreement regarding Strunk's complaint was executed on September 26, 2002. The Defendant has not complied with the terms of this agreement. Strunk has been told to sign his evaluations based on existing verbiage in the job description but never made any agreement with Mr.

Sweeney or the Agency releasing the requirement to re-write his position description.

xxv. In 2003 when Joseph Sweeney was appointed as the Deputy of DCMA Raytheon, he took the same discriminatory approach and removed all official duties from three DCMA Raytheon supervisors – Anthony DeSimone, David Grosiak, and Robert Donovan, giving these duties to younger men. This is exactly what he did to Strunk when he assumed duties as Strunk's supervisor.

xxvi. In approximately June, 2003, Strunk applied for the position of Director, Program Support and Customer Relations, DCMAE-PI, GS 1101-14/15, Boston, Massachusetts. Strunk was rated qualified and was referred for consideration for this position along with other candidates.

xxvii. Syl Hubbard of the Defense Acquisition University PMT 352 Course Director told Strunk that Linda Maturo did not have the required background, experience, or education to be sent to a PMT 352 class and that her performance was extremely poor during her attendance so much so that he remembered her name immediately.

xxviii. A rating panel was convened to rate and rank the qualified candidates. Sweeney was a member of that panel.

xxix. In approximately July, 2003, Strunk applied for the position of Contracts Mission/Resource Managers, DCMAE-O, GS 1101-14, Boston, Massachusetts under two separate DCMAE job announcements numbered DCMAE-03-2912 and DCMAE 03 2791. Strunk was initially rated qualified

for both positions and was referred for consideration for this position along with other candidates.

xxx.  Strunk was discriminated against as he was later rated not competitive and removed from referrals for consideration for this position despite the requirement under the Disabled Veterans Affirmative Action Plan which required that Strunk remain qualified and referred. By letter dated August 8, 2003, Strunk was advised by that he was not selected for this position and instead it had been awarded to Noreen Cassaro. Ms Cassaro applied for the position when the job announcement period had closed, and her application should not have been considered. Evidence submitted to a NAGE/DCMA Arbitration case documented the fact the Cassaro application was received outside the regulatory time period.

xxxi.  In his current EEO complaint to the Agency, Strunk alleged discrimination on the basis of age (DOB 09/06/53), disability (gastro-intestinal problems, muscular skeletal disorders and skin abnormalities rated 70% disabled by the Veterans Administration) and retaliation for prior EEO activity on August 8, 2003, he learned that he was not selected for the position of Director, Program Support and Customer Relations, GS-1101-14/15, under Job Announcement Number DCMAE-03–2160.

xxxii.  Later, in March, 2005, the defendant again discriminated and retaliated against Strunk by non competitively appointing Margaret Ciocca to the position of Deputy Director, Program Support and Customer Relations,

DCMAE-PI, GS 1101-14, Boston, Massachusetts. The position Deputy Director, Program Support and Customer Relations, DCMAE-PI, GS 1101-14, Boston, Massachusetts required Defense Acquisition Workforce Improvement Act Certification in Program Management and Defense Acquisition Corps Membership. Margaret Ciocca is not a member of the Defense Acquisition Corps nor does she hold any Defense Acquisition Workforce Improvement Act Certifications. Strunk was discriminated and retaliated against as Strunk was qualified for this non competitive position and not appointed despite the requirement under the Disabled Veterans Affirmative Action Plan, which requires non competitive appointments of DAV to promotional opportunities for which they are qualified. Strunk superseded the minimum qualifications for the position in question. Strunk is a member of the Defense Acquisition Corps. He should have been awarded these positions in question.

xxxiii. In July 2005 Strunk was selected for the position of Staff Contracts Officer for the Office of Chief of Staff of the Army. Strunk received an outstanding performance rating and a performance award for the period of performance from July 2005 to the present. This work is a full performance GS 14 level. Strunk have received outstanding performance rating up to Mr. Sweeney's supervision and immediately after.

xxxiv. The EEO Report of Investigation summarized Strunk's case as follows:

"•    He filed a formal discrimination complaint in 2001, and that his supervisor at that time was Mr. Sweeney.

- He suffers from a physical disability, in particular service-connected disabilities that have resulted in a 70% disability rating from the Department of Veterans Affairs (VA).
- His medical conditions are a gastro-intestinal related condition, muscular skeletal disorders and skin abnormalities, combat stress syndrome, and a 10-21 percent hearing loss in both ears, and that these conditions impact his major life activities because he has a great deal of pain, he is sometimes incontinent and has to be located close to restrooms, and he has to wear certain clothing due to the incontinence.
- Mr. Sweeney, his first line supervisor, was aware of the Complainant's condition.
- Mr. Bogusz was aware of the Complainant's medical conditions and status as disabled veteran.

"The Complainant argues that the selectee, Linda Maturo, was not qualified for the position when she was selected, as the position requires a Bachelors level degree in order to satisfy minimum eligibility requirements, and the selectee's Bachelors degree was not conferred until after her selection. The Complainant points out that he is more qualified for the position than the selectee because he:

- Has a graduate degree in finance.
- Has an undergraduate degree in law enforcement and business.
- Has an undergraduate equivalency in electrical and mechanical engineering.
- Has undergraduate course work in accounting and finance.
- Is certified in three career fields under the Defense Acquisition Workforce Improvement Act (DAWIA).
- Possesses 25 years of work experience in property management, plant clearance and disposal, contract administration, contract negotiating, and interfacing with flag officers and U.S. and foreign officials.

"The Complainant indicates that Mr. Sweeney discriminated against him based on his age, disability (physical), and reprisal for prior EEO activity, in effecting the outcome of the selection recommendation by:

- Providing unfair advantages to the selectee prior to the vacancy at issue, such as allowing the selectee to act in Mr. Sweeney's position, placing the selectee into a newly created position as branch leader without competition, and allowing the selectee to simultaneously enroll in two Program Management Tools (PMT) courses that are supposed to be taken sequentially.
- Influencing the other panel members who recommended the selections to Mr. Ernst.

"The Complainant argues that he applied for the subject vacancy and indicated that he is eligible for consideration under the Disabled Veterans Affirmative Action Plan (DVAAP). He states that if he had been referred as a DVAAP eligible candidate, and if the DCMAE supported the DVAAP, he would have been selected for the position, since DVAAP requires the recruitment and selection of disabled veterans over other candidates. He adds that not being placed on the referral certificate as a disable veteran is discriminatory." (Defendant's Tab 59, p. 4-5)

Further on in the EEO Report of Investigation it further stated with regard to Strunk's case as follows:

"The Complainant counters (IF pp 100-142):

- That the selectee, Linda Maturo, was given unfair development opportunities, which is evidenced by the fact that she was promoted from GS-11 to GS-13 without competition, and that Mr. Sweeney handled all administrative matters pertaining to her PMT training himself.
- That Mr. Sweeney intentionally prevented him from attending PMT 250 and PMT 352 to make the Complainant less competitive.
- That Mr. Sweeney's efforts to persuade other panel members to not recommend him for selection is demonstrated by his prior relationship with another panel member, Lisa Clark, and by the similarity of the manner with which they both described the reason they did not recommend him for selection consideration.
- That Mr. Sweeney's statement that the Defense Acquisition University decides who can attend courses is untrue, and that the PMT 352 course director indicated that PMT faculty is frustrated by military activities selecting people who are not qualified to attend.
- That at the time Mr. Sweeney certified the selectee in Program Management she did not possess at least 24 semester hours in accounting, business law, contracts, purchasing, economics, industrial management, marketing, quantitative methods, and organization and management or at least 24 semester hours in the career field supplemented by 12 semester hours in the fields listed above.
- That the selectee's work experience is on DCMAE District Staff only, and does not satisfy the requirement to have 4 years of acquisition experience with at least 2 years in a program office or similar organization dedicated to matrix support, with at least one year in a program management position with cost, schedule, and performance responsibilities.
- That Mr. John Beckman, DCMA HQ Human Relations, made severe objections when the selectee's application was sent for approval as she did not have the course work completed nor the degree from the University of Phoenix University." (Defendant's Tab 59, p. 9)

xxxv.   The foregoing was supported in greater detail by Strunk's sworn statement made during the EEO investigation. (Defendant's Tab 59, p. 56-62, 100-119)

86.   Undisputed.

19

Donald Strunk
By his attorney

*Scott A. Lathrop*

_____
Scott A. Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA 01450
(978) 448-8234
BBO No. 287820

Dated: July 7, 2006

## Certificate of Service

I, Scott A. Lathrop, hereby certify that I have served the foregoing Statement on the defendants by mailing this day a copy to the last known address of their Attorney of Record.

*Scott A. Lathrop*

_____
Scott A. Lathrop

Dated:   July 7, 2006

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10826 GAO

```
************************************
DONALD STRUNK                       *
    Plaintiff                       *
                                    *
v.                                  *
DONALD RUMSFELD, SECRETARY,         *
DEPARTMENT OF DEFENSE               *
    Defendants                      *
************************************
```

## AFFIDAVIT OF DONALD STRUNK

I, Donald Strunk, the plaintiff in this case, based upon my own personal knowledge, state under oath as follows:

1.  From 1984 to Feb, 2004 I resided in Stoneham, Massachusetts. From February, 2004 to August 2005 I resided in Billerica, Massachusetts. From August, 2005 to February, 2006 I resided in Woodbridge, Virginia. From February, 2006 to the present I reside in Arlington Virginia.

2.  I was an employee of the US Postal Service from March, 2002 to July, 1986.

3.  I was an employee of the Defense Contract Management Agency from July, 1986 to July, 2005.

4.  I have been an employee of the U.S. Army Chief of Staff, TMO since July, 2006.

5.  I served honorably on active duty in the US Army from December, 1976, to May, 1980.

6.  I entered Federal Civil Service with the US Postal Service in 1982, establishing a Federal Civil Service start date of September, 1978.

1

7.    I am disabled and a 70% disabled veteran.

8.    In November, 1999, I was promoted from a GS1102-12 Cost Price Analyst at DCMA
      Raytheon to a GS 1102-13 Staff Contract Administrator. I was selected by Mr. Ronald
      Murphy, a GS1401-14, who served in the position of Chief Program Integration and
      Support Group, that later became the Director of Program Support and Customer
      Relations. Mr. Murphy had been recently reassigned to this position from a Washington
      headquarters position as he needed to return to Boston to care for a family member.

9.    Mr. Murphy informed me the he had selected me based on my exemplary work record
      and extremely high recommendations from both Mr. Anthony Coit, my second tier
      supervisor, and my Commander Colonel Bryon Young. Mr. Murphy explained to me
      that I was the only Level III Contracting Professional in the Office, that Mr. Sinha, Mr.
      Corrente, Mr. Dan Wilson, Mr. Rob Benicewicz, and Mr. Byron Reynolds (all GS 1101-
      13) were level III Program Managers and that Ms. Linda Maturo (GS-0343-13) and Ms.
      Vera Daniels (GS0343-12) were Management Analysts with no Defense Acquisition
      Workforce Certifications required.

10.   Mr. Ronald Murphy stated that a Program Management type could not perform the office
      functions required and that a Contract type was required in his opinion to work with the
      DCMA subordinate offices, Program Integrators, and the external customers.

11.   In the spring of 2000 Mr. William Murphy was transferred from the Operation Group to
      the PI Group and the function of Workload Acceptance was likewise transferred. Mr.
      William Murphy was 50 at the time.

2

12. From the time of my promotion (Nov 99) until September 2000, I had worked very closely with daily contact with my Agency Headquarters staff especially with Colonel Lou Sands and with high level DCMA external customers.

13. I had also worked with DCMAE HQ Staff: Mr. Gary Antaya (Director of Finance DCMAE) as a member of management review teams, the lead providing oversight to subordinate DCMA field offices. I had worked with Mr. John Sheehan, a DCMAE GS1102-13, on a high level customer support assessment and the development of a business case. I was responsible for the Early Contract Administrative Services Executive Agency given to DCMAE for the DCMA Headquarters and also assisted in rewriting agency guidance, which renamed this function Acquisition Planning and Support Services. In November 2000, I received a scheduled step increase in my pay. In January, 2001, Mr. Joseph Sweeney signed my performance appraisal for this time period with the highest rating possible.

14. In approximately late June, 2000, the Program Integration and Support Group was elevated to a Directorate and named the Program Support and Customer Relations Directorate. Mr. Joseph Sweeney was selected over Mr. Ronald Murphy and appointed the Director. In June, 2000, the very first time I meet Mr. Sweeney as my supervisor, he told me that Acquisition Planning and Support Services (Formerly Early Contract Administrative Services) where not going to be performed by "his" directorate and that I was no longer to perform these duties or have any direct contact with any headquarters staff except through him. This left me with no work assignment.

15. In 2003 Linda Maturo in her position of Director Program Support and Customer Relations certified that Ms. Vera Daniels had Level III Contracts functional duties with

3

the directorate. My understanding of the duties of Vera Daniels in July, 2005, was that they where the same as those I had before Mr. Sweeney became Director of Program Support and Customer Relations and removed these same duties form me.

16. Mr. Sweeney told me that everyone in the new Directorate would need to be retrained into the Program Management Career Field. Everyone in the office in August, 2000, received work assignments except myself. Linda Maturo and Michael Corrente began to get assigned regularly as acting director. Linda Maturo began to get work assignments similar in nature to my former position as Early CAS Manager, and I was given the position of Training Coordinator, a position that was widely thought of as a GS 07 clerk's responsibility.

17. Mr. Sweeney intentionally changed the duty stations of Byron Reynolds and Dan Wilson to Boston to force Reynolds to retire. I later overheard him speaking in his office bragging to someone on the phone that both Byron Reynolds had retired rather accepting the change and that he was allowing Dan Wilson to now stay in New Jersey.

18. In July, 2000, Mr. Sweeney gave Linda Maturo the assignment of Industrial Analysis Coordinator so she could attend the Industrial Analysis Conference in San Diego. Maturo was scheduled to go and received orders for the trip. A week before the trip the East District Director decided to transfer the Industrial Analysis Coordinator function from Program Management Directorate back to Operations. Mr. William Murphy, a 55 year old Disabled Veteran, already had this assignment and Linda Maturo was the alternate. I was given the alternate Industrial Analysis Coordinators position and given orders to attend the San Diego Conference in August, 2000. Neither Mr. Murphy nor I was given the knowledge that the position was to be transferred out of the directorate.

4

Upon our return from the training Mr. Sweeney informed Mr. Murphy and myself that we where to be transferred to the Operations Directorate. Mr. Murphy was soon thereafter transferred to Operations as only one slot was transferred and I remained in PI.

19. Mr. William Murphy and I had had numerous conversations regarding Mr. Sweeney and the fact that we both felt he wanted to get "rid off" all of the older guys in the office as soon as he was appointed the Director. This included Byron Reynolds, Bill Murphy, Bob Benicewicz, and me.

20. By October 2000, I knew I needed to get away from this situation and Mr. Sweeney. I saw my only option that could not be blocked by Mr. Sweeney as being a hazardous duty assignment to a combat area assigned to a CAS Combat Support Team. I volunteered for an assignment to Bosnia and was accepted and assigned to a combat support team scheduled to deploy to Bosnia in January, 2001.

21. As soon as Mr. Sweeney knew that I was leaving the office on the deployment, he immediately stopped harassing me. In November and December of 2000 I spent the greater portion of my time preparing for deployment with medical exams and appointments, pre-deployment administration, and getting uniforms etc. I received orders and was scheduled to deploy on 14 January 2001.

22. The first week of January, 2001, I had an eruption of a service connected disability and was admitted into Massachusetts General Hospital. I then spent the next four months in a hospital bed and missed my deployment. At approximately the end of April, 2001, I returned to work with a surgical stoma on my stomach covered by a medical device. Mr. Sweeney immediately started to harass me just as he did before.

5

23.    Within an hour of my return to duty Mr. Sweeney called me into his office and his first
       words where something to the effect of: "So you are going to retire on a Veterans
       disability or something?" Shortly after that time he began to ridicule publicly me as a
       matter of course.

24.    On one occasion I think it was June, 2001, Mr. Sweeney used the fact that my "Fly Was
       Down" to ridicule me in front of all the persons in the office. I was unable to fully close
       my waistband because of my medical appliance which caused my zipper to open. I was
       so enraged by this embarrassment that I started to take administrative action through the
       union. I sent Mr. Sweeney an email with my objections, and he responded with a written
       apology by email.

25.    In the end of July, 2001, I had a second surgery to close the stoma and reconnect my
       intestines. I had another month convalescing and upon my return in late September,
       2001, Linda Maturo was acting Director. I met with her my first afternoon back to work
       to discuss my workload. I informed her that I was going to take my first week and
       complete and file a series of SITREP reports Mr. Sweeney had set as a job requirement,
       the majority of which covered the period in which I was out sick. Ms Maturo directed me
       not file these reports and directed me to another assignment, telling me it was a higher
       priority.

26.    Shortly after the meeting with Maturo in October, 2001, Mr. Sweeney informed me that
       he was giving me an unsatisfactory rating specifically for not filing these reports and
       withholding my step increase. Additionally that he was placing me on a performance
       improvement program from which I could be fired. I felt that Linda Maturo must have
       known this was coming, and her directive not to file the SITREP reports now made sense.

6

I felt/knew this was the culmination of Mr. Sweeney's attempts to get rid of the last older guy in his unit as Bob Benicewicz had retired. I also was made to feel Mr. Sweeney resented the fact that I had disabilities and required sick leave. I filed an EEO complaint right away.

27. I secured letters of accolade from everyone I had worked with or for at the district since November, 1999, and collected all records of my past performance. I presented this documented evidence of exemplary work record to Mr. Joseph Cass, Director DCMAE, asking for his assistance based on the evidence that except for Mr. Sweeney, anyone I ever worked for or with thought I did an excellent job and that I had performance awards for all periods of employment except under Mr. Sweeney.

28. In 2001 I filed an EEO complaint based upon disability and age against the Defendants. A settlement agreement regarding this complaint was executed on September 26, 2002. The Defendants have not complied with the terms of this agreement. I have been told to sign my evaluations based on existing verbiage but never made any agreement with Mr. Sweeney releasing the requirement to re-write my position description. After I filed the first EEO complaint against Mr. Sweeney and was thereby able to stop him from firing me, Mr. Sweeney was became nastier and increasingly harassed me about attendance, personal and other issues.

29. In 2003 when Joseph Sweeney was appointed as the Deputy of DCMA Raytheon, he took the same discriminatory approach and removed all official duties from three DCMA Raytheon supervisors Anthony DeSimone, David Grosiak, and Robert Donovan, giving these duties to younger men. This is exactly what he did to me when he assumed duties as my supervisor.

7

30.  In approximately June, 2003, I applied for the position of Director, Program Support and Customer Relations, DCMAE-PI, GS 1101-14/15, Boston, Massachusetts.

31.  I was rated qualified and was referred for consideration for this position along with other candidates.

32.  Syl Hubbard of the Defense Acquisition University PMT 352 Course Director told me that Linda Maturo did not have the required background, experience, or education to be sent to a PMT 352 class and that her performance was extremely poor during her attendance so much so that he remembered her name immediately.

33.  A rating panel was convened to rate and rank the qualified candidates. Mr. Sweeney was a member of that panel.

34.  In approximately July, 2003, I applied for the position of Contracts Mission/Resource Managers, DCMAE-O, GS 1101-14, Boston, Massachusetts under two separate DCMAE job announcements numbered DCMAE-03-2912 and DCMAE 03 2791.

35.  I was initially rated qualified for both positions and was referred for consideration for this position along with other candidates.

36.  I was discriminated against as I was later rated not competitive and removed from referrals for consideration for this position despite the requirement under the Disabled Veterans Affirmative Action Plan which required that I remain qualified and referred.

37.  By letter dated August 8, 2003, I was advised that I was not selected for this position and instead it had been awarded to Noreen Cassaro. Ms Cassaro applied for the position when the job announcement period had closed and her application should not have been considered. Evidence submitted to a NAGE/DCMA Arbitration case documents the fact the Cassaro application was received outside the regulatory time period.

8

38.     At the end of August, 2001, the DCMAE-PI Directorate moved to the 9th floor, and I was given the worst desk assignment -- one typically given to a copy or fax machine. I was the only one in the office in full view of everyone in the hallway. I asked Mr. Sweeney for a more desirable location as there where many empty cubicles and was refused. This was uncomfortable, and I received a great number of chides from co-workers due to this cubicle assignment.

39.     Mr. Sweeney did not provide me with appropriate level work. He constantly berated me and used a disrespectful tone of voice every time he spoke with me. He constantly harassed me over things such as time and attendance and computer usage that others in the District did not suffer. An example of this can be had in the fact that I was harassed for time given a suspension for attending the Raytheon Christmas function. Others from the district went on official time, and I was harassed by a one day suspension. Others from DCMI was not sure whether that was because of the Christmas party or the normal harassment I received over VA sick time Mr. Sweeney always gave me.

40.     Mr. Sweeney forced me to tell him the medical requirement or nature of every hour of sick leave I requested due to my disability or he said he would not approve it. He reiterated time and time again: "He had a right to know". Mr. Sweeney would say: "I don't' believe you; your are lying to me." I applied for numerous other jobs but was told by a number of people that Mr. Sweeney was constantly speaking in poor reference to me any time they observed him. Mr. Sweeney gave me direct insults it seemed any time I was with him and at all times tried to verbally abuse and embarrass me. Many of these were about my physical condition.

9

41.    From November 2001 to December 2001, Mr. Joseph Sweeney increased his hourly
       harassment of me. Daily in front of the entire office he would berate me personally and
       professionally screaming at me telling my work was substandard. He constantly sent
       harassing emails to me and monitored my emails when he did not treat others in the
       office the same way. This caused me to have psychological related gastro intestinal
       difficulties for which I was treated.

42.    In March, 2005, the defendants again discriminated and retaliated against me by non
       competitively appointing Margaret Ciocca to the position of Deputy Director, Program
       Support and Customer Relations, DCMAE-PI, GS 1101-14, Boston, Massachusetts.

43.    The position Deputy Director, Program Support and Customer Relations, DCMAE-PI,
       GS 1101-14, Boston, Massachusetts required Defense Acquisition Workforce
       Improvement Act Certification in Program Management and Defense Acquisition Corps
       Membership. Margaret Ciocca is not a member of the Defense Acquisition Corps nor
       does she hold any Defense Acquisition Workforce Improvement Act Certifications.

44.    I was discriminated and retaliated against as I was qualified for this non competitive
       position and not appointed despite the requirement under the Disabled Veterans
       Affirmative Action Plan, which requires non competitive appointments of DAV to
       promotional opportunities for which they are qualified.

45.    I superseded the minimum qualifications for the position in question. I am a member of
       the Defense Acquisition Corps.

46.    I should have been awarded these positions in question.

47.    By being passed over for these positions, I was discriminated against on the basis of my
       disability and prior EEO activity.

10

48. By being passed over for this and other positions, the defendants failed to advance me on account of, or to take into consideration, my disabilities and disabled veteran status.

49. By being passed over for this and other positions, I was retaliated against for having pursued an EEO claim the prior year.

50. In July 2005 I was selected for the position of Staff Contracts Officer for the Office of Chief of Staff of the Army. I received an outstanding performance rating and a performance award for the period of performance from July, 2005, to the present. This work is a full performance GS 14 level. I have received outstanding performance rating up to Mr. Sweeney's supervision and immediately after.

51. DCMA continued to discriminate against me in 2006 by not selecting me for positions I applied for with the Defense Contract Management Agency by application from the CPOL Automated Web Based application system. I am referred to DCMA as a qualified candidate and never selected for an interview.

SUBSCRIBED AND SWORN TO UNDER THE PAINS AND PENALTIES OF PERJURY
THIS  3r̲d̲  DAY OF JULY, 2006.

Donald Strunk

11